UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

MARGARET M. FLAHERTY,          :     CIVIL NO. **4:06-0235**
                               :
          Plaintiff            :
                               :     (Judge McClure)
     v.                        :
                               :     (Magistrate Judge Smyser)
JO ANNE B. BARNHART,           :
Commissioner of Social         :
Security,                      :
          Defendant            :
                               :


## REPORT AND RECOMMENDATION


     The plaintiff has brought this action under the authority of

42 U.S.C. § 405(g) to obtain judicial review of the decision of

the Commissioner of Social Security denying the claim of the

plaintiff for disability insurance benefits.


## I.  Procedural Background

     The plaintiff applied for benefits on April 17, 2002,

alleging disability since August 1, 2000 due to numerous

impairments, including fibromyalgia and chronic fatigue syndrome.

(Tr. 363-65, 383).  The plaintiff's claim was denied initially.

(Tr. 335-36, 344-47).  Upon the plaintiff's request, an

administrative law judge (ALJ) conducted a hearing in this matter

on April 30, 2003, at which the plaintiff, who was represented by

counsel, and a vocational expert testified.  (Tr. 18, 1055-83).

On May 27, 2003, the ALJ issued a decision denying the plaintiff's claim.  (Tr. 19-39).  The Appeals Council denied the plaintiff's request to review the ALJ's decision, making it the final decision of the Commissioner.  (Tr. 10-18).  42 U.S.C. § 405(g).  The plaintiff then commenced this action for judicial review of the Commissioner's final decision.  (Doc. 1).

## II.  Factual Background

The plaintiff alleged disability since August 1, 2000, and last met the insured status requirements on December 31, 2002; thus the relevant time period for adjudication in this matter is from August 1, 2000 to December 31, 2002.[1]  *See* 20 C.F.R. § 404.131 (requiring claimants to show disability on or before their date last insured).

The plaintiff was forty-nine-years-old on the date she last met the insured status requirements, and is therefore considered a younger individual under the Regulations.  (Tr. 363, 1058).  20

---

[1] The plaintiff previously applied for disability insurance benefits on October 20, 1998, alleging disability since August 30, 1997.  (Tr. 316).  Her application was denied in a July 26, 2000 decision by a different ALJ.  (Tr. 316-23).

2

C.F.R. § 404.1563(c).  She has a M.B.A. and past relevant work experience as a senior business analyst and financial analyst. (Tr. 438, 645).

The plaintiff traces her fatigue and other symptoms back to 1980, and has claimed that her symptoms worsened in 1993 and 1994.  (Tr. 640-43).  She continued to work until her job was eliminated in 1996.  (Tr. 615).  The plaintiff stopped working in September 1996 when her company was sold and she was laid off. (Tr. 614-15, 1060-61).  The plaintiff testified that she looked for other jobs but found the search exhausting, and, because she felt worse and worse, decided within one year of her layoff to stop looking for work.  (Tr. 1061-62).

She lives with her eighty-seven-year-old mother.  (Tr. 407, 1062).  She cares for her mother, drives, does minor yard work, prepares simple meals, vacuums, shops, does laundry, is able to plan and organize her day, and interacts with relatives.  (Tr. 407-09, 749).  She also cares for five cats, which includes feeding and grooming them, changing litter boxes, and providing medicine.  (Tr. 407).  The record also reveals that the plaintiff has put a lot of work into her disability benefits application,

3

maintaining extensive notes, both handwritten and typed, detailing her complaints, treatments, and medications since 1980. (Tr. 374-406, 650, 689-94, 749, 934-37).  She has also shown her various physicians such notes, which one physician described as "copious."  (Tr. 650, 656, 934-97).

Thomas G. Bowers, Ph.D., a clinical psychologist, performed neuropsychological testing on the plaintiff in January and February of 2000.  (Tr. 26, 924-33).  Dr. Bowers found the plaintiff's intellectual function to be high average to superior, found her memory skills to be average, and noted that some cerebral function tests indicated that the plaintiff's cognitive status is worse than would be expected with fibromyalgia.  (Tr. 926, 928, 929).  Dr. Bowers assessed the plaintiff's GAF (Global Assessment of Functioning) score at fifty-four, indicating moderate symptoms.[2]  On March 15, 2000, the plaintiff wrote a detailed, four-page, single-spaced typewritten response to Dr. Bowers' report, sent to Dr. Bowers, to clarify certain aspects of the report for the benefit of future readers.  (Tr. 934-37).

---

[2] A GAF in the fifty-one to sixty range indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., text revision 1994).

The plaintiff's treating rheumatologist is Sharon Banks, D.O.  (Tr. 799-803).  Dr. Banks initially examined the plaintiff on September 28, 2001.  (Tr. 799).  She noted that the plaintiff had full muscle strength but multiple fibromyalgia tender points. (Tr. 803).  Dr. Banks concluded that the plaintiff likely had fibromyalgia and opined that it kept her from working.  *Id*.  Dr. Banks recommended that the plaintiff get as much exercise as possible and prescribed Elavil.  *Id*.

When Dr. Banks re-examined the plaintiff on November 2, 2001, she noted that the plaintiff had not started taking the Elavil she prescribed.  (Tr. 799).  Dr. Banks also noted that all of the plaintiff's serological tests were normal, including tests for sedimentation rate, ANA (antinuclear antibody), and rheumatoid factor.  She noted that the plaintiff's sleeping had improved and that she occasionally took Advil and found it helpful.  (Tr. 799-800).  Dr. Banks concluded that the plaintiff's symptoms were stable and recommended that she try a more consistent dose of Advil.  *Id.*  On December 11, 2002, Dr. Banks noted that the plaintiff's fibromyalgia was "much better," despite the plaintiff's continued refusal to take the recommended pain medication.  (Tr. 917).  Dr. Banks reported that the

5

plaintiff's tender points were "only slightly tender."  (Tr. 916).

In an April 2003 "to whom it may concern" letter, Dr. Banks summarized the plaintiff's history and her one-and-a-half year treatment.  (Tr. 1037-38).  Dr. Banks noted that, in her experience, "fibromyalgia patients that have failed multiple medications and physical therapy such as [the plaintiff] ha[d] sometimes are unable to commit back to a normal working environment."  (Tr. 1038).  Dr. Banks opined that, based on the plaintiff's "past intolerance of medications and inability to tolerate fibromyalgia treatment" as well as her neuropsychiatric testing, "disability may be appropriate for her."  *Id*.

In an April 2003 "fibromyalgia interrogatory" sent to Dr. Banks by the plaintiff's attorney, Dr. Banks reported that the plaintiff had more than eleven tender points, fatigue, confusion, and good and bad days.[3]  (Tr. 1035-36).  Dr. Banks noted that the plaintiff's pain often interfered with her attention and

---

[3]  The American College of Rheumatology cites eleven of eighteen tender points as meeting the criteria for fibromyalgia.  American College of Rheumatology*, 1990 Criteria for the Classification of Fibromyalgia*, at http://www.rheumatology.org/ publications/classification/fibromyalgia/fibro.asp. (last visited August 23, 2006).

concentration and opined that she would miss work more than three times a month.  (Tr. 1036).

The plaintiff began seeing Paul Eslinger, Ph.D., a clinical neuropsychologist, in October 2002.  (Tr. 915).  At the plaintiff's first visit, on October 31, 2002, Dr. Eslinger noted that she was "minimally treated" for her depression and anxiety and did not have a specific treatment plan in place.  (Tr. 909). Dr. Eslinger also noted that the plaintiff had articulate, generally coherent, and well-organized speech, but could ramble and become confused at times, and was experiencing depression increased by a recent loss.  *Id.*  Dr. Eslinger noted that the plaintiff was clearly distressed and appeared to be experiencing a major depression without psychotic features.  Dr. Eslinger proposed psychotherapy.  *Id.*

In April 2003, Dr. Eslinger prepared a letter summarizing the plaintiff's medical and neuropsychological history.  (Tr. 1041-42).  The bulk of this letter consisted of Dr. Eslinger's general, academic observations about the relationship between fibromyalgia, chronic fatigue syndrome, and mental functioning in general.  *Id.*  Dr. Eslinger noted that he has referred the

7

plaintiff to a psychiatrist, Dr. Kuhlengel.  (Tr. 1042).  Dr.

Eslinger also completed a medical source statement regarding the

plaintiff's work-related mental activities and stated the opinion

that the plaintiff would miss work more than twice a month.  (Tr.

1039).

Barbara Kuhlengel, M.D., conducted a psychiatric evaluation

of the plaintiff on March 31, 2003.  (Tr. 1018).  Dr. Kuhlengel

noted that the plaintiff dressed well, was fully oriented, had

normal speech, had moderate anxiety, and reported no delusion,

suicidal ideations, paranoia, or hallucinations.  (Tr. 1018).

Dr. Kuhlengel further noted that the plaintiff frequently changed

topic and had "ok" concentration, insight, and judgment.  *Id*.

Dr. Kuhlengel opined that the plaintiff had a GAF of fifty for

the current session as well as for the previous year.[4]  (Tr.

1018).

Margaret Kreher, M.D., was the plaintiff's primary care

provider since 1999.  (Tr. 655-88).  In February 2001, the

plaintiff visited Dr. Kreher for follow-up treatment of her

---

[4]  A GAF in the forty-one to fifty range indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., text revision 1994).

chronic fatigue syndrome.  Dr. Kreher noted that the plaintiff

had pharyngitis, which was complicating a ten-day viral illness

she had, and looked fatigued.  (Tr. 661).  Dr. Kreher also noted

that the plaintiff had experienced a significant amount of

depression around the Christmas holidays but that the depression

was abating.  *Id*.  Dr. Kreher noted that the plaintiff

"appear[ed] to be coping well, but [wa]s quite disabled."  Dr.

Kreher also noted, however, that the plaintiff would look into

vocational rehabilitation.  *Id*.  By March 2001, the plaintiff's

pharyngitis symptoms were greatly improved.  (Tr. 659).  In May

2001, Dr. Kreher noted that the plaintiff still complained of

depression, for which she declined pharmacologic intervention,

but that she was "not as depressed as she was" and was "doing a

bit more" and "getting out a bit more."  (Tr. 656).  Dr. Kreher

noted that the plaintiff kept a daily activity journal, which she

submitted to Dr. Kreher, and which indicated that she could

perform "at best" three hours of meaningful activity each day.

*Id.*


III.  **Disability Determination Process**

     The Commissioner has promulgated regulations creating a

five-step process to determine if a claimant is disabled.  The

9

ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents her from doing past relevant work; and (5) whether the claimant's impairment prevents her from doing any other work.  20 C.F.R. § 404.1520.

Here, the ALJ determined that: (1) the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date; (2) the plaintiff's depression, fibromyalgia, chronic fatigue syndrome, anxiety, personality disorder, vertigo, mild neurocognitive impairment, and allergies/asthma were severe impairments;[5] (3) but did not meet or medically equal any listed impairment(s); (4) that the plaintiff was unable to perform her past relevant work as a financial analyst; but (5) had the residual functional capacity to perform less than the full range of light unskilled work. (Tr. 27-32).

---

[5] The ALJ found that the plaintiff's irritable bowel syndrome, acid reflux, and migraine headaches were not severe impairments.  (Tr. 27).

The ALJ limited the plaintiff's residual functional capacity
for light work to work that involved no working at unprotected
heights, no exposure to moving machinery, no competing time
demands, no piece rate work; that allowed the plaintiff to sit
and stand when necessary; and that involved only one- to two-step
job operations that could be performed by someone with a moderate
limitation on her ability to maintain consistent work effort.
(Tr. 32).  Because the vocational expert testified that a person
with such a residual functional capacity would still be capable
of performing work that existed in significant numbers in the
national economy, as a general clerical worker, file clerk,
security worker, or laundry worker, the plaintiff was found to be
not disabled under the Act.  (Tr. 31).


**IV.  Discussion**

The plaintiff argues that the ALJ erred in: (1) determining
her residual functional capacity; and (2) not applying the
doctrine of issue preclusion to a prior final decision.


A.  Standard of Review

If the Commissioner's decision is supported by substantial
evidence it must be affirmed. 42 U.S.C. § 405(g).  Substantial

evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)(quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).  Substantial evidence is more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

To facilitate review of the Commissioner's decision under the substantial evidence standard, the Commissioner's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700,

704 (3d Cir. 1981).  Conflicts in the evidence must be resolved

and the Commissioner must indicate which evidence was accepted,

which evidence was rejected, and the reasons for rejecting

certain evidence. *Id*. at 706-707.  In determining if the

Commissioner's decision is supported by substantial evidence the

court must scrutinize the record as a whole.  *Smith v. Califano*,

637 F.2d 968, 970 (3d Cir. 1981).


The Commissioner has promulgated regulations creating a

five-step process to determine if a claimant is disabled.  The

Commissioner must sequentially determine: (1) whether the

claimant is engaged in substantial gainful activity; (2) whether

the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals a listed impairment; (4) whether the

claimant's impairment prevents the claimant from doing past

relevant work; and, (5) whether the claimant's impairment

prevents the claimant from doing any other work.  *See* 20 C.F.R.

§404.1520 and 20 C.F.R. §416.920.


The disability determination involves shifting burdens of

proof.  The initial burden rests with the claimant to demonstrate

that she is unable to engage in her past relevant work.  If the

13

claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

<u>    B.  Whether the ALJ erred in determining the plaintiff's residual functional capacity</u>

The plaintiff contends that the ALJ erred in determining her residual functional capacity.  Specifically, the plaintiff contends that the ALJ wrongly disregarded the opinions of Drs. Banks, Bowers, Elsinger, Kuhlengel, and Kreher, all of whom opined that the plaintiff was disabled due to fibromyalgia, fatigue, and cognitive dysfunction.  (Doc. No. 9 at 13-14).

The ALJ assigned Drs. Banks', Bowers', Kreher's, Kuhlengel's, and Eslinger's opinions little weight, finding them all inconsistent with the other evidence of record.  The responsibility for determining a claimant's residual functional capacity rests solely with the ALJ and is based on consideration of all of the evidence of record.  20 C.F.R. §§ 404.1527(e)(2), 404.1545, 404.1546.  The ALJ must not reject the opinion of a treating physician unless she can point to substantial medical

14

evidence that states an opposite view.  *Rossi v. Califano*, 602 F.2d 55 (3d Cir. 1979).

The ALJ noted that Dr. Banks' opinion that the plaintiff's fibromyalgia was limiting her ability to work was based solely on a single, initial visit, and mainly related the plaintiff's own subjective complaints.  (Tr. 29, 803).

The ALJ also gave little weight to Dr. Bowers' GAF score. The ALJ noted that, in the year following Dr. Bowers' early 2001 GAF assessment of moderate symptoms, subsequent progress reports indicated that the plaintiff's depression had lessened.  (Tr. 26).

As for Dr. Kreher's February 2001 disability opinion, the ALJ found it internally inconsistent.  Although Dr. Kreher opined that the plaintiff was disabled due to depression, she also observed that the plaintiff was coping well and suggested that the plaintiff look into vocational rehabilitation.  (Tr. 29, 661).  Moreover, Dr. Kreher noted that the plaintiff complained of depression but declined pharmacologic intervention.  (Tr. 656).

15

The ALJ also found that the opinions of Drs. Elsinger and
Kuhlengel merited little weight.  Dr. Kuhlengel had opined that
the plaintiff had a GAF of fifty for the previous year.  (Tr.
1018).  Dr. Eslinger's April 2003 letter, accompanying his
medical source statement, had stated observations about the
relationship between fibromyalgia, chronic fatigue syndrome and
mental functioning.

The ALJ's explanations for her rejection of the opinions of
these treating physicians are succinctly stated: "Dr. Kreher's
opinion is not consistent with and is not supported by other
substantial evidence of record."  (Tr. 29).  "Dr. Banks' opinion
is not supported by and is not consistent with the other evidence
of record and, as this was Dr. Banks' first visit with the
claimant, is largely based on the claimant's subjective
complaints."  *Id.*  "In regard to Dr. Banks' April 16, 2003
conclusion that disability may be appropriate for the claimant,
and the April 29, 2003 assessment that the claimant is incapable
of even low stress work due to chronic pain and fatigue . . .,
these assessments are not supported by the other evidence of
record and are inconsistent with the claimant's activities of

16

daily living which include taking care of her elderly mother."
(Tr. 29-30).  Dr. Kuhlengel's "global assessment of functioning
of 50 . . . is based on the claimant's mental capacity at the
time of the assessment and does not reflect the claimant's
overall mental capacity for an extended period of time . . .
[and] . . . is not supported by the other evidence of record
including the claimant's conservative treatment history and
fairly substantial activities of daily living."  (Tr. 29).  Dr.
Eslinger's "assessment is not supported by or consistent with the
other evidence of record as well as the claimant's activities of
daily living."  (Tr. 30).

    The ALJ has simply rejected the treating physicians' reports
and opinions that support a disability finding as not consistent
with other evidence and with the plaintiff's daily activities
without adequate explanation or a basis in other medical
evidence.  Given that fibromyalgia and chronic fatigue syndrome
are impairments diagnosed and measured by patients' reports of
subjective symptoms, a diminishment of physicians' reports and

opinions because they are based upon subjective symptoms is

seemingly not a sound analytical approach.[6]


     C.  Whether the ALJ erred in finding that the plaintiff's
depression did not meet or equal Listing 12.04

     The plaintiff also contends that the doctrine of issue

preclusion should have bound the ALJ to a residual functional

capacity finding from a prior final decision of the

Commissioner's.  (Doc. No. 9 at 20-21).  In a July 26, 2000

decision, another ALJ had found that the plaintiff was capable of

less than the full range of sedentary work.  (Tr. 320).  The

plaintiff, citing 42 U.S.C. § 405(h), argues that the residual

functional capacity finding in that final decision was binding on

the ALJ in the present case.  (Doc. 9 at 20).  Thus, the

plaintiff contends, the ALJ's finding in the present case, that

the plaintiff has the residual functional capacity for light

work, can not stand.  (Tr. 32).


     The Commissioner's distinction is based upon the fact that

the July 26, 2000 decision concerned a different time period, and

therefore a different issue.  The Commissioner argues that issue

---

     [6]  On the other hand, we are not quite sure how a physician or an ALJ is
expected to make a diagnosis or finding that is contrary to subjective symptoms.

preclusion prevents only the re-litigation of identical issues. *Henglein v. Colt Industries Operating Corp,.* 260 F.3d 201, 209 (3d. Cir. 2001).  When, as here, an "entirely new SSA claim is brought, issue preclusion will not prevent a new determination of issues decided in a previous suit."  *Rucker v. Shalala,* 894 F.Supp. 1209, 1217-1218 (S.D.Ind. 1995) *(*citing *Reynolds v. Bowen,* 844 F.2d 451, 453-54 (7th Cir.1988)).  As *Reynolds* explained:

> Issue preclusion only prevents relitigation of issues within the time period of each claim. It does not prevent relitigation of issues, such as a claimant's residual functional capacity, in subsequent time periods, because such would not be re-litigation at all. This means that when a claimant brings a new claim, issues in a current claim are decided independently of the previous claim. In this context, such a previous determination has no weight in a subsequent case. This is so because it is undoubtedly possible that a claimant's ability to perform her past relevant work changes over time.

*Id*. at 453-54.

The time periods concerned in the plaintiff's prior and current application are distinct.  The Commissioner's July 26, 2000 final decision addressed the plaintiff's alleged disability since August 30, 1997.  (Tr. 316).  The plaintiff's current disability claim begins after that prior decision was issued, with her alleged onset date of August 1, 2000.  However, that

19

does not mean that the two claims are "completely separate, distinct, and unrelated applications." *Reynolds v. Bowen,* 844 F.2d 451, 453-54 (7th Cir. 1988).  Even if the ALJ in the present case based her determination on different evidence than the ALJ in the July 2000 decision had considered, some material difference must be apparent from the evidence to justify a departure from a factual conclusion drawn already by the Commissioner in the claimant's favor concerning her residual functional capacity.  It may not be forgotten or dismissed that the ALJ has an explanatory duty.  *Cotter v. Harris, supra*.  We construe and apply *Cotter* to require that a decision be rational. The ALJ did not even discuss or consider the earlier agency adjudication that the plaintiff was limited to sedentary work, much less try to distinguish it.  In 2003, without reference to the earlier finding, the Commissioner found that her residual functional capacity had increased to permit her to perform light work.  This distinction of this earlier finding needs an explanation.

**V.  Conclusion**

On the basis of the foregoing, it is recommended that the appeal of the plaintiff be granted and that the case be remanded

to the Commissioner with instructions to further consider
treating physicians' reports and opinions and to consider the
plaintiff's residual functional capacity to be that found in 2003
unless evidence of a basis for a material distinction of the
earlier finding is found to exist.

_____

                                    ***/s/ J. Andrew Smyser***
                                    J. Andrew Smyser
                                    Magistrate Judge

Dated:   September 1, 2006.